**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

DOMINIC ALAN STE. MARIE,

                                                    Civil No. 24-1113 (JRT/LIB)

                          Plaintiff,

v.

                                        **MEMORANDUM OPINION AND ORDER**
BRETT MUSICH and SHAWN GRIEGO,          **DENYING DEFENDANTS' MOTION FOR**
*individually and in their official capacities*          **SUMMARY JUDGMENT**
*as police officers for the City of*
*Moorhead*,

                          Defendants.

Andrew M. Irlbeck, **ANDREW IRLBECK, LAWYER, CHARTERED**, 332
Minnesota Street, Suite W1610, St. Paul, MN 55101; Nicholas Ratkowski,
**RATKOWSKI LAW PLLC**, 332 Minnesota Street, Suite W1610, St. Paul, MN
55101; and Samuel A. Savage, **SAVAGE WESTRICK P.L.L.P.**, 900 American
Boulevard East, Suite 241, Bloomington, MN 55420, for Plaintiff.

Ashley Marie Ramstad, Carlos B. Soto-Quezada, and Jason M. Hiveley,
**IVERSON REUVERS**, 9321 Ensign Avenue South, Bloomington, MN 55438,
for Defendants.

Dominic Alan Ste. Marie brings this case under 42 U.S.C. § 1983, alleging that two

Moorhead police officers, Brett Musich and Shawn Griego, used excessive force when

arresting him in 2018.  Officers Musich and Griego move for summary judgment, arguing

that they are shielded from liability by qualified immunity.  Because the Court concludes

that genuine issues of fact remain as to whether Officers Musich and Griego violated Ste.

Marie's clearly established constitutional rights, the Court will deny Defendants' Motion for Summary Judgment.

## BACKGROUND

### I.    FACTS

The Court's consideration of the facts in this case was aided greatly by video footage recorded by the camera on Officer Musich's squad car.  (Hiveley Decl. ¶ 8, Ex. 7 ("Squad Video").)

#### A.    Investigation and Sobriety Tests

On June 18, 2018, Moorhead police were called to the scene of a car accident. Officer Musich, one of the Defendants in this case, and another officer, Officer Werk, were the first two officers to arrive.  Officer Griego, the other Defendant, arrived after.  (Hiveley Decl. ¶ 6, Ex. 5 ("Griego Report").)  Officer Griego, Officer Werk, and at least two firefighters began gathering information from witnesses.[1]

Musich approached Ste. Marie, who was sitting in the grass next to the road, and began questioning him about the accident.  (Squad Video at 5:20–50.)  Ste. Marie's evident intoxication and lack of cooperation caused Musich to say one point, "don't do that, or you're gonna go in handcuffs."  (*Id.* at 6:50.)  Ste. Marie eventually told Musich

---

[1] Officer Griego spoke to a witness who had seen Ste. Marie being "aggressive with another person involved in the crash."  (Griego Report ¶ 3.)  He was told that Ste. Marie's wife Jenae had "pushed [Ste. Marie] down [because] he was getting upset with the other driver and [Ste. Marie] responded by throwing one of his shoes."  (*Id.* ¶ 4.)

that he had been driving his vehicle, turned too fast, and crashed into another vehicle. (*Id.* at 9:00.) Musich asked Ste. Marie how much alcohol he had consumed, and Ste. Marie answered "oh, plenty." (*Id.* at 10:00.) When asked for specifics, Ste. Marie estimated "five to six" drinks. (*Id.* at 10:50.) Musich told Ste. Marie that paramedics would check him for injuries, and "as long as they say you're good, then we'll go from there." (*Id.* at 11:00.) Ste. Marie responded, "sounds good, man." (*Id.* at 11:08.)

Musich asked Ste. Marie to walk with him across the road to where his squad car was parked, and asked Ste. Marie to sit on the curb. (*Id*. at 12:30.) Musich left Ste. Marie alone briefly and then returned to stand with Ste. Marie to wait for paramedics. (*Id*. at 14:05.) Paramedics arrived and asked Ste. Marie if he needed treatment, which he declined. (*Id.* at 15:00.) For nearly ten minutes, Musich administered a variety of field sobriety examinations, including an eye test, walking test, and balancing test. Ste. Marie, visibly intoxicated, attempted to complete the tests but could not. (*Id.* at 16:30–25:14.)

Musich asked Ste. Marie to step off the road into the grass and asked him to submit to a breathalyzer test. Officer Griego then approached and stood next to Musich and Ste. Marie in the grass. (*Id.* at 25:00). Ste. Marie protested to the breathalyzer, saying "I didn't do anything," "come on guys," and "are you fucking kidding me?" (*Id.* at 25:30.) Ste. Marie ultimately submitted to the test, which showed a .342 blood alcohol content. (Hiveley Decl. ¶ 5, Ex. 4 ("Musich's Report") at ¶ 10.)

**B.** **Officers' Use of Force**

As Musich checked the breathalyzer, Ste. Marie stumbled slightly and began looking toward the picket fence next to the grass enclosing the yard of the house nearest to the road. (*Id.* at 25:30.) Ste. Marie raised his arms above his head and placed his hands on the top of the fence. (*Id.* at 26:00).

Both Musich and Griego stepped toward Ste. Marie. (*Id.* at 26:05.) Musich grabbed Ste. Marie's shoulders and attempted to lower his harms, while repeating multiple times "turn around and put your hands behind your back," and "you're under arrest." (*Id.* at 26:10.) Ste. Marie tried to keep his arms in front of his body, saying "really," and "are you kidding me?" (*Id*. at 26:11.) Musich lowered Ste. Marie's left arm, and Griego grabbed Ste. Marie as well. (*Id*.) With both Musich and Griego still holding Ste. Marie, Musich said "if you're not going to put your hands behind your back, you're going to the ground." (*Id*. at 26:12). Musich delivered a knee strike to the back of Ste. Marie's leg, spun him around, and tackled him into the grass. (*Id*. at 26:22.)

Ste. Marie was forced to the ground face-first, with Musich pressing down on the top of Ste. Marie's body, and Griego on his lower back and legs. (*Id*. at 26:20.) Musich again said "put your hands behind your back," then grabbed Ste. Marie's right hand and pulled it across Ste. Marie's body, thus flipping him over on to his back. (*Id*. at 26:23.) Griego said "you're gonna get tased." (*Id*. at 26:26.) While Griego was removing his taser from his belt, Ste. Marie continued to struggle and appeared to reach for Griego. (*Id*. at 26:28.) Musich, while grabbing for control of Ste. Marie's hands, said "no I got it, I'll spray

-4-

him." (*Id*. at 26:30.)  Musich pepper sprayed Ste. Marie's face.  (*Id*. at 26:30.)  Ste. Marie was finally rolled on to his stomach, with Musich holding Ste. Marie's head and Griego sitting on top of Ste. Marie's legs.  (*Id*. at 26:35.)

As Musich continued trying to pull Musich's hands together behind his back, Ste. Marie said, "are you fucking kidding me?"  (*Id.* at 26:40.)  At this point, a fireman on the scene jogged over to the three men, got down on his knees, and began using his hands to press Ste. Marie down.  (*Id*. at 26:45.)  One of the other men asked Musich "what do you want done?" and Musich replied "hold him, hold him."  (*Id*. 26:50.)  Griego, who had been holding his taser throughout this time, administered multiple shocks of the taser to what appeared to be Ste. Marie's butt, legs, or lower back.  (*Id*. at 26:45.)  Musich shouted, "we need another officer here," and Officer Werk approached and joined in holding down Ste. Marie.  (*Id*. at 26:53.)

By this time, four individuals—Musich, Griego, Werk, and the fireman—were all pressing down on Ste. Marie, who began to yell "get off me."  (*Id*. at 27:05.)  Defendants continued repeating "put your hands behind your back."  (*Id*. at 27:10.)  Musich appeared to deliver several knee strikes to Ste. Marie's midsection or arm.  (*Id.* at 27:08.)[2]  Another

---

[2] Officer Musich stated in a deposition that he delivered knee strikes "to, like, the upper part of his outer biceps."  (Decl. of Jason M. Hiveley, Ex. 10, Deposition of Brett Musich, at 50, Aug. 1, 2025, Docket No. 21-10).  As to the number of knee strikes, Musich stated "I believe . . . it was two knee strikes.  I don't recall exactly how many it was . . . I don't think it was more than four in total."  (*Id.* at 50.)

firefighter, making five total officials, approached the group, kneeled down, and grabbed one of Ste. Marie's legs.  (*Id*. at 27:20.)

Ste. Marie was handcuffed roughly 90 seconds after he was first tackled.  Musich told Ste. Marie, "you are under arrest."  (*Id*. at 27:50.)  Ste. Marie appeared to continue moving around, and Musich stated "don't move, you're tightening the handcuffs up."  (*Id*. at 28:00.)  Officer Werk noted that Ste. Marie was bleeding on his hands.  (*Id*.)  Ste. Marie can be heard in the video exclaiming in pain.  (*Id*. at 28:00.)

### C.     Officers Transport Ste. Marie to Jail

Officers then placed Ste. Marie in Musich's vehicle.  Camera footage from within Officer Musich's vehicle shows officers shoving Ste. Marie, appearing to be completely limp, horizontally into the back seat of the vehicle.  (Decl. of Nico Ratkowksi ¶ 1, Ex. A ("Rear Video"), 32:00–33:00, Aug. 21, 2025, Docket No. 24.)  Officers did not fasten Ste. Marie's seatbelt.  (*Id.*)  Ste. Marie can be heard breathing heavily and grunting in pain intermittently during the car ride to the police station.  (*Id.* at 35:55.)  Once the car arrived at the police station, after Ste. Marie appeared incapable or unwilling to sit up straight, officers forcefully removed him from the vehicle.  (*Id.* 40:00–41:15.)

### D.     Ste. Marie's Injuries

Ste. Marie was released from jail the following day, June 19, and spent that day at home.  (Decl. of Jason M. Hively ¶ 2, Ex. 1 (Dep. of Dominic A. Ste. Marie ("Pl.'s Dep.")) at

45, Aug. 1, 2025, Docket No. 21.)[3]  The next day, June 20th, Ste. Marie states that he felt badly injured but "powered through" and went to work.  (*Id.*)  But at lunch, coworkers told him he "looked as white as a ghost," prompting him to go to Sanford Hospital.  (*Id*. at 46.)  At the hospital, Ste. Marie was informed that he had "seven broken ribs . . . a pneumothorax, and one of your lungs has almost completely collapsed."  (*Id*. at 46–47.)  A doctor told Ste. Marie that he was "bleeding internally" and needed to be taken to the emergency room immediately or Ste. Marie "might not live."  (*Id.* at 47.)  At the emergency room, doctors "immediately inserted a chest tube," and then, two days later, performed "emergency surgery to repair the hole in [Ste. Marie's] chest wall and to plate four of [his] ribs . . . ."  (*Id*.) (*See also* Ratkowski Decl. ¶ 2, Ex. B ("Medical Records") at 106–110.)  Defendants dispute that Ste. Marie's injuries were caused by Musich and Griego, and argue that the car accident caused the injuries.

## II.     PROCEDURAL HISTORY

Ste. Marie filed his Complaint on April 1, 2024, approximately six years after the incident took place. (Complaint, Apr. 1, 2024, Docket No. 1.)  On August 1, 2025, Defendants moved for summary judgment arguing that Ste. Marie's claims should be dismissed in their entirety because Defendants are entitled to qualified immunity. (Defs.' Mot. Summ. J, Aug. 1, 2025, Docket No. 18.)

---

[3] The Court will refer to the internal pagination within the transcript of Ste. Marie's deposition.

**DISCUSSION**

I.      **STANDARD OF REVIEW**

      A.      **Summary Judgment**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

      B.      **Qualified Immunity**

"Qualified immunity shields a public official from liability for civil damages when his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Blazek v. City of Iowa City*, 761 F.3d 920, 922 (8th Cir. 2014) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Id*. (quoting *Stanton v. Sims*, 571 U.S. 3, 6 (2013)).  "An official is entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to the

plaintiff, establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation." *Malone v. Hinman*, 847 F.3d 949, 952 (8th Cir. 2017).

"[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances" as long as they have "fair warning" that their treatment was unconstitutional or unlawful. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The "clearly-established right" standard does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *id.* at 741–42 (noting that such precedent may be in the form of controlling authority or a robust consensus of persuasive authority).

"When a defendant asserts qualified immunity at the summary judgment stage, the plaintiff must produce evidence sufficient to create a genuine issue of fact regarding whether the defendant violated a clearly established right." *Bishop v. Glazier,* 723 F.3d 957, 961 (8th Cir. 2013).

## II.    QUALIFIED IMMUNITY ANALYSIS

The U.S. Supreme Court has long held that "[t]he right to be free from excessive force in the context of an arrest is clearly established under the Fourth Amendment's prohibition against unreasonable searches and seizures." *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009). All individuals are "entitled to be free from excessive force under the facts and circumstances presented in [a given] case." *Id*. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would

be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 202 (2001).

"When evaluating a Fourth Amendment excessive force claim under § 1983," the Court must determine "whether the amount of force used was **objectively reasonable** under the particular circumstances." *Kohorst v. Smith*, 968 F.3d 871, 876 (8th Cir. 2020) (emphasis added). The Eighth Circuit has recognized "the inherent difficulty of analyzing these fact-intensive [excessive force] cases." *Jackson v. Stair*, 944 F.3d 704, 711 (8th Cir. 2019). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

To determine whether an officer's conduct was objectively reasonable, the Court must weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 989 (8th Cir. 2009) (quoting *Graham*, 490 U.S. at 396). The Court must look to the "totality of the circumstances" and focus on factors identified in *Graham*, including "the **severity of the crime** at issue, whether the suspect poses an **immediate threat to the safety of the officers** or others, and whether [the suspect] is **actively resisting arrest or attempting to evade arrest** by flight." *Id*. (emphasis added) (quoting *Graham*, 490 U.S. at 396). "The degree of injury suffered may

also be relevant to show the amount and type of force used." *Fischer v. Hoven*, 925 F.3d 986, 988 (8th Cir. 2019).

### A.    Reasonableness of Musich and Griego's Use of Force

The Court will assess the reasonableness of Musich and Griego's use of force in light of the factors established in *Graham*.

### 1.    Takedown and Knee Strikes

The Court first considers Musich and Griego's initial takedown of Ste. Marie and the knee strikes delivered by Musich.  Defendants contend that all three factors from *Graham* weigh in favor of this use of force to arrest Ste. Marie.  *See Graham*, 490 U.S. at 396.  The Court ultimately concludes that each factor weighs against qualified immunity.

**First**, although Ste. Marie's offense—driving under the influence of alcohol and crashing into another vehicle—is very serious, the Court finds that the severity-of-the-crime factor cuts against Defendants' motion for summary judgment.  In the excessive-force context, it has long been held that "force is least justified against **nonviolent misdemeanants** who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public."  *Brown*, 574 F.3d at 499; *see Shannon v. Koehler*, 616 F.3d 855, 862 (8th Cir. 2010) (denying qualified immunity in part because the record supported a finding that plaintiff was "was not suspected of committing a serious crime").  While the Court will consider below the issue of whether Ste. Marie was resisting or attempting to flee, the offense that Ste. Marie was arrested for—driving under the influence—is not a crime that would give officers reason to believe Ste. Marie

was violent or dangerous.  *See Vanderhoef v. Dixon*, 938 F.3d 271, 277 (6th Cir. 2019) ("[T]raffic offenses . . . commonly fall within the lowest rung of unlawful activity.").  The Court finds that the nature of Ste. Marie's offense weighs against a finding that the officers' use of force was reasonable.[4]

**Second**, turning to whether Ste. Marie posed a threat to the safety of the officers or others, Defendants argue that Ste. Marie showed aggression to the officers, before and during his arrest, and that a reasonable officer would have believed Ste. Marie posed a threat to the safety of the officers or others.  But Musich's squad camera video tells a different story—and provides no evidence that Ste. Marie posed a threat to anyone at the scene, including the officers.  There is no doubt that Ste. Marie was frustrated at being asked to complete field sobriety tests, and ultimately, was upset at being arrested.  But more is required to demonstrate that an arrested person posed a threat to the safety of officers or bystanders.  For example, in *Tatum v. Robinson*, the Eighth Circuit described that although the plaintiff "argued angrily . . . and did not comply with an order," it was unreasonable to conclude he was a "threat to anyone's safety."  858 F.3d 544, 548 (8th Cir. 2017).  The court in *Tatum* distinguished that case from *Cook v. City of Bella Villa*, 582

---

[4] *Compare Henderson v. Munn*, 439 F.3d 497, 503 (8th Cir. 2006) (concluding that the "negligible severity" of plaintiff's offenses, including "giving a false name, resisting arrest, public intoxication, and the two outstanding warrants for failure to appear," did not "tip the scales of reasonableness" in the officer's favor), *with Boudoin v. Harsson*, 962 F.3d 1034, 1041–42 (8th Cir. 2020) (finding that "fleeing from four other officers at speeds exceeding 100 miles per hour in evening traffic," which "demonstrates an extreme indifference to the value of human life," is a severe offense weighing in favor of the use of force).

F.3d 840, 849 (8th Cir. 2009), in which an "officer, alone and outnumbered by unpredictable intoxicated people, reasonably tased individual who yelled at and stepped toward him[.]" *Tatum*, 858 F.3d at 549. The present case can also be distinguished from *Cook*—here, the officers far outnumbered Ste. Marie, and critically, Ste. Marie exhibited no violent or threatening behavior of any kind throughout his **nearly 20-minute interaction with Musich** prior to the officers initiating physical force. Moreover, Ste. Marie had been frisked for weapons and was found to be unarmed. Taking all these facts, in conjunction with Ste. Marie's short stature and clear lack of physical coordination due to his intoxication, the Court concludes that the absence of threat posed by Ste. Marie weighs against granting summary judgment on qualified immunity grounds.

**Third**, the Court considers whether Ste. Marie was actively resisting arrest or attempting to flee. An "officer is entitled to use the force necessary to effect an arrest and even when a suspect is passively resistant, somewhat more force may reasonably be required." *Aden as Tr. for Estate of Aden v. City of Bloomington, Minnesota*, 128 F.4th 952, 958 (8th Cir. 2025) (internal quotation marks omitted). Defendants argue that Ste. Marie failed to obey the officers' commands, actively and passively resisted arrest despite attempts to handcuff him, and that when Ste. Marie placed his hands on top of the fence,

"[b]oth officers thought Ste. Marie was going to attempt to jump the fence." (Defs.' Mem. Supp. Mot. Summary J. ("Defs.' Mem.") at 7, Aug. 1, 2025, Docket No. 20.)[5]

It is undisputed that Ste. Marie verbally objected to participating in field sobriety tests and to being arrested, and that Ste. Marie failed to promptly comply with Officer Musich and Griego's initial attempt to handcuff and detain him.  But because of the strong evidence that Ste. Marie was not forcefully resisting arrest or fleeing, the Court concludes that a jury could find that Musich and Griego's use of force was unreasonable.

In support of the lawfulness of Musich and Griego's conduct in this case, Defendants rely on *Kohorst v. Smith*, 968 F.3d 871 (8th Cir. 2020), *Wertish v. Krueger,* 433 F.3d 1062 (8th Cir. 2006), *Ehlers v. City of Rapid City*, 846 F.3d 1002 (8th Cir. 2017), and *Fischer v. Hoven*, 925 F.3d 986 (8th Cir. 2019), all cases in which the Eighth Circuit found that qualified immunity shielded officers from liability when they used force similar to that employed by Musich and Griego.  But the circumstances faced by the officers here differ significantly from each case relied upon by Defendants.  For example, in *Kohorst*, the officer was alone on the street at night, and the Eighth Circuit noted that "as the only law enforcement officer on the scene Officer Smith needed to be wary of Kohorst because

---

[5] Defendants also argue that prior to their arrival on the scene, Officers Musich and Griego had been informed that Ste. Marie was behaving aggressively.  However, Ste. Marie disputes the admissibility and reliability of these statements.  Given that undisputed squad video shows Ste. Marie behaving calmly when the Officers arrived on the scene, and for the nearly 20 minutes of interactions with Officer Musich thereafter, any information the officers may have received prior to their arrival on the scene does not impact the Court's disposition of this motion.

he could be aided at any time by the second suspect." *Kohorst*, 968 F.3d at 877.  *Fischer*, similarly, involved an officer facing "a tense, unpredictable situation—the only officer on the scene with two hostile, intoxicated individuals." 925 F.3d at 989.  This case—in broad daylight, with officers far outnumbering Ste. Marie, not vice versa—is clearly different. This case is also distinct from *Wertish*, where the defendant had driven "erratically and dangerously for many miles on a public highway, ignoring the flashing lights and wailing siren" of the following police vehicle.  433 F.3d at 1066.  Wertish also "failed to comply with orders to get out of his vehicle," allowing the court to find it objectively reasonable for the arresting officer to "pull [defendant] from the truck and handcuff him."  *Id.*  And in *Ehlers*, the defendant "continued walking" away from the officers after being told repeatedly to put his hands behind his back, including "passing [the officer] closely," blatantly expressing his noncompliance.  846 F.3d at 1011.  No such conduct took place here.

Defendants also rely on the fact that Ste. Marie briefly placed his hands on top of the picket fence next to the road after he completed the breath test, arguing that Ste. Marie was contemplating a daring attempt to jump the fence.  However, taking into account Ste. Marie's physical condition, intoxication, and the height of the fence, it strains credulity to contend that Ste. Marie was a genuine threat to flee.

At bottom, viewing the facts in the light most favorable to the nonmoving party—Ste. Marie—the Court finds that Ste. Marie's lack of resistance to arrest or

attempts to flee could lead a jury to conclude that Musich and Griego's use of force was unreasonable and excessive.

**Finally**, the Court turns to the nature of Ste. Marie's injuries.  Ste. Marie presents evidence that Musich and Griego's tackling, knee strikes, and prolonged force pressing Ste. Marie into the ground caused seven broken ribs, pneumothorax, a collapsed lung, requiring emergency surgery.  (Pl.'s Dep. at 46–47; Medical Records at 106–110.)  In an excessive force case, "[t]he degree of injury should not be dispositive" but "is certainly relevant insofar as it tends to show the amount and type of force used."  *See Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011).  Ste. Marie's severe injuries, and their cause, are therefore relevant to whether Musich and Griego's use of force was objectively reasonable.  *See Montoya v. City of Flandreau*, 669 F.3d 867, 872 (8th Cir. 2012) (considering in part "the degree of the injury suffered (a broken leg), we cannot say the force used . . . was objectively reasonable").  The Court concludes that genuine disputes of fact remain as to the causation and extent of Ste. Marie's injuries, further weighing against summary judgment on qualified immunity grounds in this case.

For all these reasons, Ste. Marie has carried his burden to "produce evidence sufficient to create a genuine issue of fact regarding whether the [Officers] violated a clearly established right" in their use of takedown force and knee strikes.  *Bishop,* 723 F.3d at 961.

### 2.    Officer Griego's Use of Taser and Officer Musich's Use of Chemical Irritant

The Court next turns to the reasonableness of Officer Griego's use of a taser and Officer Musich's use of a chemical irritant.

It is well-established in the Eighth Circuit that each deployment of taser force must be constitutionally reasonable. *See Jackson*, 944 F.3d at 714.  In *Jackson*, the Eighth Circuit found that qualified immunity was appropriate for two out of three taser firings, but not for one of them, because the defendant "was still reeling from the initial tasing," and "did not appear to pose a threat to law enforcement, resist arrest, or flee—he was on his back, writhing on the ground."  *Id.* at 711–712.  Similarly, in *Brown v. City of Golden Valley*, the officer's use of a taser was held to be unreasonable where the suspect "was a frightened passenger who had disobeyed two orders to end her phone call with a 911 operator, and four officers were handling the traffic stop."  574 F.3d at 498.  The Eighth Circuit contrasted the facts in *Brown* with *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004), where the defendant "was behind his truck, pacing, yelling, and swearing at [the officer], who at the time was the only officer on the scene."  *Brown*, 574 F.3d at 498.  *See also Coker v. Arkansas State Police*, 734 F.3d 838, 843 (8th Cir. 2013) (holding qualified immunity not appropriate where "a reasonable jury could find . . . [the officer's] decision to strike [defendant] using a metal flashlight after [defendant] was already on the ground and allegedly complying with [the officer's] demands").

After Musich and Griego took Ste. Marie to the ground, Griego tased Ste. Marie mode three times.[6]  Even setting aside whether the officers' use of force in taking Ste. Marie to the ground was reasonable, the Court concludes that genuine disputes of fact remain as to whether each of Griego's uses of taser force thereafter was excessive.  Taking the video evidence and factual allegations in the light most favorable to Ste. Marie, it appears that each discharge of Griego's taser occurred without clear warning, while Ste. Marie was on the ground with his movements restricted by multiple officers.  These facts all cut against the reasonableness of the use of taser force.  *See Jackson*, 944 F.3d at 711–12 (taser use unreasonable where exercised "without warning," when the defendant "did not have time to react with compliance or continued resistance before the [additional] tasing was deployed.").  Here, there is at minimum, "a genuine issue of material fact as to whether [all three] tasing[s] amounted to excessive force."  *Id.* at 712.  Summary judgment based on qualified immunity is therefore inappropriate regarding Griego's use of the taser.

Next, the Court considers Musich's use of pepper spray—again, while Ste. Marie was on the ground, subdued by multiple officers.  "Pepper spray can cause more than

---

[6] Officer Griego's "Taser Use Report," indicates three applications of "drive stun" tasings. (Ratkowski Decl. ¶ 5, Ex. E.)  But at the summary judgment hearing in this case, counsel for Defendants conceded that "[t]here is a dispute about" how many times Officer Griego tased Ste. Marie.  Given that Eighth Circuit precedent guides that each use of taser force must be constitutionally reasonable, the genuine dispute of material as to how many times Ste. Marie was tased cuts against the appropriateness of qualified immunity at this stage.

temporary pain." *Tatum v. Robinson*, 858 F.3d 544, 550 (8th Cir. 2017). "Courts have consistently concluded that using pepper spray is reasonable . . . where the plaintiff was either resisting arrest or refusing police requests." *Id.* (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002)). However, here, fact disputes remain as to whether it was reasonable for the officers to conclude that Ste. Marie resisting arrest at all, and if so, if that resistance justified the use of pepper spray. A jury could find that Officer Musich's use of pepper spray was unreasonable when considering the totality of the circumstances, and summary judgment based on qualified immunity is therefore unwarranted.

### B.      Existence of a Clearly Established Constitutional Right

Finally, the Court rejects Defendants' arguments that Ste. Marie has not identified a clearly established constitutional right to be free from the specific force used in this case. Although it "is not enough" to cite to the "general proposition" that officers may not use excessive force in effectuating an arrest, *see Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam), the Eighth Circuit has repeatedly held that it is "clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public," *Brown*, 574 F.3d at 499. *See also Shannon*, 616 F.3d at 864 (noting that courts have long "announced that the use of force against a suspect who was not threatening and not resisting may be unlawful"). Furthermore, the Eighth Circuit has stated that "prisoners have a clearly established right to be free from a Taser shock or its equivalent

in the absence of a security threat." *Id.* at 500.  Taking the facts in the light most favorable to Ste. Marie, he was a nonviolent misdemeanant who was not fleeing or resisting arrest. Ste. Marie has met his burden at this stage: he has shown that "the contours of the right at issue were sufficiently clear that a reasonable official standing in [Officer Griego and Officer Musich's] shoes would have understood that the amount of force [they] used was excessive[.]" *Shannon*, 616 F.3d at 864–65.

## CONCLUSION

Genuine disputes of material fact remain as to whether Officer Griego and Officer Musich violated Ste. Marie's clearly established constitutional right to be free from excessive force under the Fourth Amendment.  The Court will therefore deny Defendants' Motion for Summary Judgment on qualified immunity grounds.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Docket No. [18]) is **DENIED.**

DATED:  March 16, 2026           \_\_\_\_\_/s/ John R. Tunheim\_\_\_\_\_
at Minneapolis, Minnesota.           JOHN R. TUNHEIM
                                     United States District Judge